**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**

**FILED**

2008 Jun 06 PM 01:04

CLERK U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
TOLEDO



Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 07-33276 |
| | ) | |
| Carl L. Swanbeck and | ) | Chapter 7 |
| Angela I. Swanbeck, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION AND ORDER REGARDING MOTION TO DISMISS

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 25] and Debtor's response [Doc. #32]. The court held a hearing on the motion that Debtor Angela Swanbeck, Debtors' counsel and counsel for the UST attended in person and at which the parties had the opportunity to present testimony and other evidence in support of their respective positions. The court has jurisdiction over this case under 28 U.S.C. §1334 and the general order of reference entered in this district. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(A). Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will deny the UST's motion.

# BACKGROUND[1]

Debtors are married and have two dependent children. Carl Swanbeck works at Chef's Garden where he has been employed for approximately two years. Angela Swanbeck has been employed at Cardinal Brokerage Insurance for approximately fourteen years. On July 31, 2007, Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code, stating that their debts are primarily consumer debts.

Debtors' Schedule A shows that Debtors own real estate that is their primary residence and that they value at $78,940, as well as two unimproved lots at Kelley's Island, Ohio, valued at $25,200. Debtors' Schedule D shows total secured debt in the amount of $199,800. Their secured debts include $152,000 secured by a mortgage granted by them in 2004 on both their home and the two unimproved lots, as well as $11,000 secured by a 2003 Dodge truck, $31,000 secured by a 2006 Honda Accord, and $5,800 secured by a 1984 cruiser boat valued by Debtors at $500. Debtors' Statement of Intention indicates that they intend to reaffirm their mortgage debt and the debt owed on the two motor vehicles. However, at the time of the hearing on the instant motion, no reaffirmation agreement had been filed on the mortgage debt, Debtors had ceased making monthly payments on one of their vehicles and the court had granted relief from the automatic stay with respect to both the Dodge truck and the Honda Accord. Debtors had also ceased making payments on their boat.

Debtors' Schedule F shows unsecured nonpriority debts, consisting almost entirely of credit card obligations, in the total amount of $80,161. Their Summary of Schedules also shows unsecured priority debt in the amount of $13,000. Although Debtors' "Schedule E - Creditors Holding Unsecured Priority Claims" is blank, their amended Schedule J shows monthly expenses for taxes owed to the Internal Revenue Service for tax years 2005 and 2006 and to the State of Ohio for the year 2006.

Debtors' amended Schedule I shows total monthly income after payroll deductions in the amount of $5,462. Their amended Schedule J shows total monthly expenses in the amount of $5,435, which includes, among other things, a mortgage expense of $1,257, a real estate tax expense of $150 that includes taxes on both their home and the unimproved lots, income tax expenses totaling $490 for past due federal and state income taxes, and school and daycare expenses of $508. Debtors' other expenses reflect a modest lifestyle. Their monthly income after expenses is shown as $27.

Debtors' Form B22A calculating the means test shows that their annualized current monthly income

---

[1] The parties offered no testimony at the hearing; however, at the UST's request, the court takes judicial notice of the contents of its case docket and the Debtors' schedules. *See* Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990).

2

at the time of filing their case was well above the median income for a family of four in Ohio. No presumption of abuse arose under § 707(b)(2) after the calculation of allowed deductions. Instead, the UST filed a timely motion to dismiss for abuse under § 707(b)(3) based on the totality of the circumstances.

## LAW AND ANALYSIS

This case must be decided under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, ("BAPCPA" or "the Act") because it was filed on July 31, 2007, after the effective date of the Act. Where debts are primarily consumer debts, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3) by requiring a court to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).[2]

At the hearing in this case, the UST indicated that his motion is brought under both prongs of § 707(b)(3). He presents two arguments. First, he argues that it would be unfair to Debtors' unsecured creditors to allow Debtors to reaffirm a debt that is under-secured by a mortgage on not only their home but also the two unimproved recreational lots on Kelley's Island by over $45,000 and that a reaffirmation will permit Debtors to retain recreational property and give preferential treatment to one at least partially unsecured creditor. The UST further argues that given Debtors' above median income, they are not needy

---

[2] As this court noted in an earlier opinion:
While Congress has clearly lowered the dismissal standard, articulation of what that change really means in decision-making in a particular case is a slippery enterprise at best. A totality of circumstances amounting to substantial abuse would obviously also amount to abuse. The converse is not necessarily true. Perhaps more telling legislative evidence of a Congressional intent that bankruptcy courts should now afford less deference to a debtor's choice of Chapter 7 relief is the elimination from amended § 707(b) of the language in former § 707(b) stating that "[t]here shall be a presumption in favor of granting the relief requested by the debtor."
*In re Carney*, No. 07-31690, 2007 WL 4287855, *2, 2007 Bankr. LEXIS 4100, *7 (Bankr. N.D. Ohio December 5, 2007).

and have the ability to repay some amount to their unsecured creditors through a Chapter 13 plan. As the movant, the UST carries the overall burden of demonstrating, by at least a preponderance of the evidence, that Debtors' case should be dismissed. *In re Gonzalez*, 378 B.R. 168, 172 (Bankr. N.D. Ohio 2007).

## I. 11 U.S.C. § 707(b)(3)(A) - Bad Faith Analysis

Under § 707(b)(3)(A), the court must consider the totality of the circumstances when determining whether Debtors have acted in bad faith in filing their Chapter 7 bankruptcy petition. *See In re Eckard,* No. 07-62268, 2008 WL 859155, *3 (Bankr. N.D. Ohio March 31, 2008); *In re Jarrell,* 364 B.R. 899 (Bankr. N.D. Tex. 2007); *cf. Krohn*, 886 F.2d at 126 (explaining in a pre-BAPCPA case that "a court should ascertain from the totality of the circumstances whether [the debtor] is merely seeking an advantage over his creditors, or instead is 'honest,' in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings"). The Sixth Circuit has articulated the following nonexclusive list of factors that may be relevant to this determination: (1) the debtor's good faith and candor in filing schedules and other documents, (2) whether the debtor has engaged in "eve of bankruptcy purchases," and (3) whether he was forced into Chapter 7 by unforeseen or catastrophic events. *Id.*

The UST does not challenge Debtors' candor in filing their bankruptcy schedules and presents no evidence relating to what prompted Debtors to file this case. The court recognizes that Debtors' indicated intention to reaffirm the debt on and thus retain the unimproved recreational lots on Kelley's Island is the flash point in this case. This fact, without more, is an insufficient basis on which to conclude that Debtors filed their bankruptcy petition in bad faith. There is no evidence showing, for example, that Debtors granted the mortgage to the secured creditor with the intent of sheltering the property in contemplation of filing bankruptcy. Rather, the evidence suggests otherwise. They granted the mortgage approximately three years before this case was commenced. As the UST presents no other basis for believing that Debtors acted in bad faith in filing their petition, the court finds that he has failed to meet his burden of proof on this issue.

## II. 11 U.S.C. § 707(b)(3)(B) - "Neediness" Analysis

Under § 707(b)(3)(B), the court must determine whether the debtor is "needy," that is, whether "his financial predicament warrants the discharge of his debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to this determination include the ability to repay debts out of future earnings, which alone is sufficient to warrant dismissal under some circumstances. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable

4

through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126-27. "Courts generally evaluate as a component of a debtor's ability to pay whether there would be sufficient income in excess of reasonably necessary expenses to fund a Chapter 13 plan." *Mestemaker*, 359 F.3d at 856 (citing *In re Behlke*, 358 F.3d 429, 435 (6th Cir. 2004)).

In this case, Debtors appear to enjoy stable income. Carl Swanbeck has worked for his employer for two years and Angela Swanbeck has worked for the same employer for fourteen years. And there is no indication that Debtors are in danger of losing their jobs or expect a material decrease in their income in the next five years. As Debtors with regular, stable income, they are eligible for adjustment of their debts through Chapter 13 since their debts are less than the statutory eligibility limits. *See* 11 U.S.C. §§ 109(e), 101(30). Nevertheless, Debtors' monthly income after expenses is only $27. And, with the exception of Debtors' mortgage expense, the UST points to no expense that they could reduce significantly without depriving themselves or their dependents of life's necessities so as to fund a meaningful Chapter 13 plan.[3] Debtors have reduced their expenses by surrendering one vehicle and stopping monthly payments on their boat, indicating a willingness to surrender the boat if that creditor so desires, notwithstanding its *de minimis* value.

With respect to Debtors' mortgage debt, the UST does not argue that the overall amount of the debt or the monthly debt service expense is unreasonable, but instead objects because the debt is secured not only by Debtors' home but by the undeveloped recreational lots and, at filing, was under-secured by approximately $48,000 according to Debtors' schedules. The UST contends that the cost of retaining the recreational lots is approximately $200 to $300 per month, amounts representing a portion of the monthly mortgage and property tax payments. The Trustee further argues that it is an abuse of the provisions of Chapter 7 to permit Debtors to pay mortgagee American General Financial Services, Inc., 100% of the amount it is owed, including the portion of the debt that is unsecured, while their remaining unsecured creditors will receive nothing. These days many Chapter 7 debtors are reaffirming what is now undersecured debt on homes and motor vehicles while discharging other types of unsecured debt, with the resulting effect that some unsecured debt will likely be paid notwithstanding a Chapter 7 bankruptcy filing and some will

---

[3] On Schedule J, Debtors budget a total of $490 per month for payment of unsecured priority tax debt, which, according to Debtors Summary of Schedules appears to total $13,000. This payment could likely be reduced by approximately $270 if paid over a sixty-month period, a time period that coincides with the applicable commitment period of a Chapter 13 plan for above median income debtors such as the Swanbecks. *See* 11 U.S.C. §§ 1322(a)(2) & 1325(b)(4)(A). The UST presumably did not argue this point in light of the fact that Debtors' amended Schedule J does not reflect the cost of providing Angela Swanbeck transportation after surrendering her vehicle. *See* Doc. # 41, Amended Schedule J.

5

not. But that difference in resulting treatment for types of unsecured debt generally arises from the obvious economic and legal leverage secured creditors such as American General enjoy over unsecured creditors both inside and outside of bankruptcy. The fact that in this case the collateral that American General obtained for its now undersecured loan to Debtors includes two unimproved lots on a Lake Erie resort island does not alone make Debtors' request to discharge credit card debt while reaffirming undersecured debt an abuse given that the overall amount of the debt secured by their real estate has not been questioned.

Moreover, because Debtors' home and the two recreational lots are encumbered by the same mortgage, Debtors cannot, as argued by the UST, simply surrender the recreational property or segregate some portion of their debt obligation that represents debt secured by the recreational property to make funds available to pay their unsecured creditors. If the properties were not intertwined as collateral for the same debt and instead secured separate debts, this would be a different case. Nevertheless, the court recognizes that Debtors' could take advantage of provisions of Chapter 13 that would allow bifurcation of the unsecured portion of the mortgage debt since it is not secured solely by a mortgage on Debtors' principal residence. *See* 11 U.S.C. § 1322(b)(2). There is disagreement as to the permissible treatment of the secured portion of the debt after such bifurcation, with some courts concluding that the debtor must pay in full the allowed amount of the secured claim over the Chapter 13 plan's duration and others concluding that the debtor may alternatively, under § 1322(b)(5), choose to cure any default and simply maintain payments while the case is pending when the last payment is due after the date on which the final payment under the plan is due. *See* Keith M. Lundin, *Chapter 13 Bankruptcy, 3d Ed.* 128.20-24 (2000 & Supp. 2004) (discussing the two options and citing cases). Under either treatment, all of the unsecured claims, including the unsecured portion of the mortgage creditor's claim, would then be treated similarly in Chapter 13. However, in this case, under either treatment, unsecured creditors would receive no appreciable benefit. According to Debtors' schedules, the mortgagee holds a secured claim in the amount of $104,140. If, after bifurcation of the claim, Debtors must pay the allowed amount of the secured claim in full over sixty months, the applicable commitment period of a Chapter 13 plan for above median income debtors such as the Swanbecks, they would be required to pay approximately $1,735 per month before any calculation of interest. As this amount greatly exceeds their current mortgage payment, Debtors' unsecured creditors obviously would not benefit since no additional funds would be made available to fund a Chapter 13 plan. A similar result obtains and no additional funds are made available if Debtors can choose under § 1325(b)(5)

6

to maintain their current payments while the case is pending.[4]

The court also considers the fact that Debtors could surrender both their home and the recreational lots. Based on the scheduled values of their real estate, this scenario would add approximately $48,000 to their existing total of $80,162.92 in unsecured debt and would require Debtors to obtain alternate housing for themselves and their children. Debtors now live in a very modest home, not a luxury home. The court will not surmise as to the cost of alternative housing if they did surrender all of the real property and no evidence of such has been offered. Rather, the court merely notes that Debtors' current monthly mortgage payment is not overall an unreasonable amount. While the net result of surrender of the properties and termination of the associated debt service might provide additional funds in Debtors' monthly budget, the mere mathematical ability to fund a Chapter 13 plan is alone insufficient in this case to find abuse of the provisions of Chapter 7. *See In re Beckerman,* 381 B.R. 841, 846, 849 (Bankr. E.D. Mich. 2008).

The availability of debtors' remedies under state law (such as a municipal court trusteeship or credit counseling proceedings that will stop wage garnishments under Ohio law) and the relief that might be afforded through private negotiations are other factors the Sixth Circuit has identified as relevant in deciding whether it would be an abuse to grant a Chapter 7 discharge in a particular case. Neither party has addressed these factors in this case. As the United States Trustee bears the burden of proof on the motion, *In re Wright*, 364 B.R. 640, 643 (Bankr. N. D. Ohio 2007), the court will assume that there are no such state law remedies or private negotiations that will assist in resolving Debtors' financial problems.

## CONCLUSION

Having reviewed the totality of the circumstances in this case, the court concludes that the UST has failed to demonstrate that Debtors filed their bankruptcy petition in bad faith or that they are not needy and, therefore, that granting them relief in this case would be an abuse of the provisions of Chapter 7.

**THEREFORE,** for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that the United States Trustee's motion to dismiss [Doc. # 25] be, and hereby is, **DENIED.**

---

[4] The court takes no position in this opinion as to whether a Chapter 13 debtor can use both the power to modify in § 1322(b)(2) and the power to cure a default and maintain payments under § 1322(b)(5) when the debt is not protected from modification by § 1322(b)(2).